**Federal Defenders**
OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, NY 10601-4150
Tel: (914) 428-7124   Fax: (914) 948-5109

Barry D. Leiwant
*Interim Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

November 7, 2023

VIA EMAIL AND ECF

The Honorable Vincent L. Briccetti
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

  Re: *United States v. Anthony Jacobs*, 23-cr-413 (VB)

Dear Honorable Judge Briccetti:

  I respectfully submit this letter in support of a downward variance for Mr. Jacobs's sentencing scheduled before this Court on November 21, 2023, at 11:00 a.m.

## I. The JSIN Materials Should Not be Included in the Pre-Sentence Report ("PSR")

  Mr. Jacobs objects to the inclusion of JSIN data here as insufficiently reliable for the Court to take into account for sentencing. Such statistical information is not listed in Federal Rule of Criminal Procedure 32 or in Monograph 107 as one of the items that must be in a Presentence Report. More importantly, while properly conducted statistical analysis may be quite relevant to sentencing in certain cases, the data as presented in this case are skewed upward and therefore misleading.

  Although the reason for these being included in the PSR is not explicitly stated other than this District was chosen as part of a pilot study, it appears this information is being offered to provide information about defendants similarly situated to Mr. Jacobs. However, this information is not reliable for several reasons, as detailed below, which skews the data upwards suggesting a longer prison sentence.

- The JSIN data includes only "length of imprisonment," rather than "sentence length." As a result, both probationary sentences and alternative confinements are excluded, skewing the results upward.

- The JSIN data accounts for "time served" sentences differently than probationary sentences, treating the number of months served prior to sentencing as the sentence intended by the judge, even if the intent of the judge was to impose a noncustodial sentence.
- Sentences with § 5K1.1 departure are excluded. This skews the data away from 0, when underlying conduct is arguably similar.
- Career offenders and defendants facing mandatory minimums are automatically included.
- The data here includes only national results. Due to regional differences, for example in how state cases enhancing the federal guideline range are prosecuted, data from this district as well as from the Second Circuit should also be included if any statistics are to be considered.
- The data presented here only include the last five years. It should instead include all the available data, going back at least ten years.
- JSIN "averages" omits information on where sentences fall within the guideline range. There is nothing inherently wrong with an average as a standalone descriptive statistic, but statistics are not neutral. It is only natural to project onto a statistic certain assumption about a group of say, similarly situated defendants.
- JSIN relies on different data than are publicly available from U.S.S.C. or on additional unstated parameters. Federal defender organizations and the Sentencing Resource Counsel analysts have tried to replicate JSIN. It is not clear what else is determining their values.

In sum, JSIN provides aggregate statistics for all defendants that fall in a particular guidelines cell (offense level and criminal history category), but the offenders included in this cell are not necessarily "similar" and there is no way to determine in which ways they are similar or dissimilar. On the contrary, for the reasons noted above, the data is skewed upward in a way that cannot be accounted for. JSIN is a data tool and with all data tools, the developer's choices of what data to include, exclude, report, and not report will affect the tool's results. Due to the Commission's choices within JSIN, the tool's default makes it seem like judges impose more severe sentences than they actually do. The inclusion of this information in the report is therefore misleading and contrary to an individualized assessment of defendants to

The Honorable Vincent L. Briccetti                                             Page 3 of 8
*U.S. v. Jacobs*, 23-cr-413 (VB)                                          Sentencing Memorandum

be sentenced, as required under 18 U.S.C. § 3553(a) and the Due Process Clause. It is also unclear how BOP will utilize this information in assessing Mr. Jacob's security classification. For these reasons, this data should not be included in the PSR, and the Court should not place substantial weight on the JSIN data presented in this case.

## II.     The Nature and Circumstances of the Offense

On February 12, 2023, at 1:00 in the afternoon, Mr. Jacobs took a car service, which picked him up at his home, the same address on file with his probation officer, and drove him to a bodega in Yonkers. PSR ¶¶ 9, 10. Mr. Jacobs entered the bodega and went to a backroom before re-entering and going to the front of the store and spoke to a man in the store. *Id.* ¶ 10. He waited for a woman to purchase a six-pack of beer and leave the bodega. *Id.* After she left, he quickly walked to the front counter, brandished a gun, and demanded all the money in the register. *Id.* The clerk opened the registered and gave Mr. Jacobs $200. *Id.* Mr. Jacobs left the bodega and rushed toward the car service vehicle that had dropped him off and left. *Id.* ¶ 11.

## III.    History and Characteristics of Mr. Jacobs

Mr. Jacobs was born on June 15, 2003, to Kesha Gist and Anthony Jacobs. *Id.* ¶ 43. He is their only child. *Id.* ¶ 45. He is the youngest in his family, with two older paternal half-sisters, and an older maternal half-brother who is deceased. *Id.* ¶¶ 46, 47. His half-sisters were primarily raised by their mother, but Mr. Jacobs was raised along-side his older half-brother, Donovan Rose, and the two were close. *Id.* His father worked in the construction and maintenance fields and his mother works as a manager at a hospital. *Id.* ¶ 44.

Mr. Jacobs was raised in a residential area in Yonkers with his family. *Id.* ¶ 48. His home was a loving and supportive environment. *Id.* ¶ 56. He felt particularly close to his father growing up but became closer to his mom as he grew older. *Id.* ¶ 48. He enjoyed participating in community basketball program at the YMCA during his childhood starting when he was 6 years old. *Id.* ¶¶ 48, 56. He stayed active with sports throughout his childhood. Letter from Kesha L. Gist, dated October 27, 2023, attached hereto as Exhibit A.

When Mr. Jacobs was in early adolescence, the family relocated after his parents separated for a period. *Id.*; PSR ¶¶ 48, 56. Although his parents eventually reconciled, they stayed in this new area of Yonkers and soon learned that it was one where drug activity and violence were prevalent. Exhibit A; PSR ¶¶ 48, 56. He frequently saw drug sales and people

using drugs in his neighborhood. PSR ¶ 48. With the drug activity, there was violence as well. Although he did not witness any shootings, he was aware of them occurring in his neighborhood, and he witnessed people being assaulted. *Id.* He was also the victim of a robbery when he was 14 years old during which he was stabbed in the right leg and right ribcage. *Id.* ¶¶ 48, 57. He received stiches for these injuries and has scars on both his leg and abdomen as a result. *Id.* ¶ 57. No one was ever arrested for the robbery or assault. *Id.*

Following this move, Mr. Jacobs started demonstrating behavioral issues. *Id.* ¶¶ 48, 56. He would leave school without permission and argue with teachers. *Id.* ¶ 48. Due to his behavioral issues, he was unable to play basketball for his school team. *Id.* He began smoking marijuana when he was 15 years old and began spending time outside his home. *Id.* ¶¶ 48, 61. He continued to smoke marijuana until his arrest here. *Id.* ¶ 61.

He left school in the 8th grade after being arrested at the age of 14. *Id.* ¶¶ 32, 65. Within six months he was arrested again and sentenced to a year of residential placement. *Id.* ¶ 33. While in the custody of the New York State Office of Children and Family Services ("OCFS"), when Mr. Jacobs was 15 years old, his older brother Donovan died at the age of 25 from complications from epilepsy. *Id.* ¶¶ 33, 47. Mr. Jacobs was permitted to attend a private funeral under escort and then returned to custody following the funeral. *Id.* ¶ 47.

He eventually obtained his GED while in custody. *Id.* ¶ 67. He met Erica Scott when he was 15 years old, and they dated on and off since that time. *Id.* ¶ 51. When he was 16 years old, he started using Percocet and took it on a weekly basis. *Id.* ¶ 62. He started using one pill or half a pill, but that usage increased over time. *Id.* He also began consuming "lean" a mixture of promethazine and codeine. *Id.* ¶ 63.

When he was 17 years old, he began a relationship with Makaila Mason, whom he dated for two years. *Id.* ¶ 49. They share a son together who was born in 2021. *Id.* ¶ 50. Their son resides with her, and Mr. Jacobs had regular contact with his son prior to his arrest. *Id.* Shortly after he became a father, Mr. Jacobs lost his own father. *Id.* ¶ 44. His father died in December 2021 at the age of 52 due to complications from COVID-19. *Id.* Mr. Jacobs struggled after losing his half-brother and father in untimely deaths within a short time frame. *Id.* ¶ 56. Following the death of his father, his use of Percocet increased to daily use as he tried to cope with the death of his father. *Id.* ¶ 62. He was using four pills of Percocet daily at the time of his arrest here. *Id.* His

usage of lean also increased to multiple times of day, every day. *Id.* ¶ 63.

After he and Ms. Mason ended their relationship, he began seeing Ms. Scott and has dated her since last summer. *Id.* ¶ 51. They have a son together who was born earlier this summer while Mr. Jacobs was in custody for this case. *Id.* ¶52. It was difficult for Mr. Jacobs to not be able to be present for the birth of their child. *Id.* He has only seen his son at court appearances, and they are still trying to coordinate a visit together at MDC where Mr. Jacobs is currently housed. *Id.*

## IV.   A Downward Variance Would Provide a Sentence That is Sufficient, But Not Greater Than Necessary

The overriding sentencing principle, set forth in 18 U.S.C. § 3553(a), is to "impose a sentence that is sufficient, but not greater than necessary" to comply with the purposes of sentencing, which are retribution, deterrence, public protection, and rehabilitation. Imposing a downward variance here would provide a sufficient, but not greater than necessary sentence as it would reflect the serious nature of the offense, promote respect for the law, and provides a just punishment for the offense given the equities outlined below.

### A. Mr. Jacob's Childhood

Mr. Jacobs was fortunate to have grown up with two loving parents who provided him a stable environment. However, at a critical stage in his development, the family moved from their residential neighborhood to a more violent neighborhood that was plagued by drug activity and violence. At the age of 14, he was the victim of a serious robbery during which he was stabbed twice and suffered significant injuries. Mr. Jacobs quickly became enmeshed in this community. He began using drugs, which only increased with time as he began getting arrested more frequently. The trajectory of his life is particularly devastating because he appears to have been an excellent student with a bright future. *Id.* ¶ 56; Exhibit A.

During this time, he suffered two profound, untimely losses. His half-brother, the only sibling he had been raised with, died during an epileptic seizure at the age of 25. Mr. Jacobs was only 15 years old at the time, and because he was in custody, he could not be with his family to grieve. He was permitted to attend a private funeral while being escorted but was not otherwise permitted to be with his family during that difficult time. Within three short years, his father, who was only 52 years old, passed away due to complications from COVID-19, shortly after Mr.

Jacobs himself had become a father. This was particularly devastating for Mr. Jacobs as he was the youngest of his siblings and the closest to their father. Letter from Chalane Robins, attached hereto as Exhibit B. These two untimely losses of family members that were central to his world had a profound impact on him. It was difficult for his mother to see how this was impacting him as she too was mourning the loss of her eldest son and her husband. Exhibit A. He has never really addressed the impact of these losses and how they have shaped him. Exhibit B; Letter from Denice Enders, dated October 27, 2023, attached hereto as Exhibit C. Instead, he self-medicated with Percocet and lean.

### B. Untreated Drug Addiction

Mr. Jacobs struggled with drug usage in his early teen years. His usage of marijuana, but more significantly Percocet and lean, appears to have skyrocketed following the death of his brother and father. Unable to process these feelings, he numbed himself with drugs to avoid having to deal with these losses. Although Mr. Jacobs does not have any diagnosed mental health conditions, he has not had an opportunity to speak to any professional regarding these losses and how they may have impacted him. Certainly, his resulting drug usage impaired his thought processes and likely contributed to his poor decision making and actions here.

### C. Mr. Jacobs's Age and Immaturity

Mr. Jacob's young age and immaturity at the time of this offense certainly played a role in his criminal conduct. This assertion find support in a report by the Sentencing Commission, which has acknowledged the growing recognition that age plays a significant role in criminal behavior. *See* U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM (May 2015) at 5, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf. Importantly, the Sentencing Commission has found that people may not gain full reasoning skill and ability until they have reached the age of 25. *Id.* at 5. The prefrontal cortex of the brain, which is utilized in impulse control, emotional reactions, executive function, and decision-making, is the last part of the brain to develop. *Id.* at 6. In evaluating criminal conduct, the Sentencing Commission expanded their own definition of "youthful offender" to those as old as 25 when they face federal sentencing. *Id.* at 5. Mr. Jacobs was 19 when he became involved in the instant offense. As he acknowledges, although he was old enough to know right from wrong, he was still "a childish

The Honorable Vincent L. Briccetti                                                                 Page 7 of 8
*U.S. v. Jacobs*, 23-cr-413 (VB)                                                             Sentencing Memorandum

kid." Letter from Anthony Jacobs, attached hereto as Exhibit D. His young age and lack of development certainly played a significant role in his impulsive and dangers actions.

### D. Mr. Jacob's Early Acceptance of Responsibility

Mr. Jacobs pleaded guilty and accepted responsibility within six months of his arrest. He also pleaded guilty to an information, thus obviating the need for the government to present the case to a grand jury, and produce discovery. Further, by pleading guilty, he did not take up additional court resources by the filing of motions. Although he receives acceptance of responsibility points under U.S.S.G. §§ 3E1.1(a), (b), he would have received these points even if he had not waived indictment, waived discovery production, and filed motions. He respectfully requests that his early acceptance of responsibly and saving of judicial resources should be accounted for in his sentence.

### E. Mr. Jacobs Has Faced Harsh Conditions While in Custody

As Mr. Jacobs acknowledges, his time in custody is the first time he has ever served time in a true prison setting with other adults and the experience has been eye-opening. Exhibit D. He does not wish to spend the rest of his life in this predicament. He has also served the vast majority of his sentence at the Metropolitan Detention Center in Brooklyn. PSR ¶ 6. This facility is severely understaffed, which results in inmates consistently being locked down in their cells for extended periods of time. Mr. Jacobs kept track of the days in which he spent locked down in his cell since arriving at MDC in March 2023. From the time he arrived until the filing of this letter, he has spent 245 days at MDC Brooklyn. He has been locked down for 137 of those 245 days—more than 50% of his time at the facility.[1]

It has also made it more difficult for him to visit with his family. His family is located in Yonkers and visiting him in Brooklyn would have been difficult under the best of circumstances. However, with understaffing at the facility, his family, specifically his mother, has made this trek to Brooklyn only to be told after she arrived that her visit was rescheduled for the end of the day. As a result, she could not meet with him at all. His youngest son has never been able to visit him at this facility and Mr. Jacobs has never had the opportunity to hold him, which is particularly

---

[1] The lockdowns per month are as follows: March 2023—19 days; April 2023—20 days; May 2023—17 day; June 2023—20 days; July 2023—28 days; August 2023—19 days; September 2023—9 days; October 2023—3 days; November 2023, thus far—2 days.

The Honorable Vincent L. Briccetti                                          Page 8 of 8
*U.S. v. Jacobs*, 23-cr-413 (VB)                                     Sentencing Memorandum

difficult as he was unable to be there for his son's birth. Video visits are also frequently cancelled because of understaffing at the facility. For a first exposure to a jail setting, this facility is certainly one of the harshest.

### F. Mr. Jacob's Still Enjoys the Support of His Family

Despite these obstacles, Mr. Jacobs still enjoys the love and support of his family. Exhibits A-C; Letter from Keyanna Gist, dated October 23, 2023, attached hereto as Exhibit E. His mother has a place for him to return to once he is back in the community and is prepared to offer him support as he transitions back to life outside of custody. Exhibit A. Although she did not realize the extent of his actions prior to his arrest here, she appreciates now what he has gone through and wants to support him in any way to ensure he leads a law-abiding life in the future. Exhibit A. Further, his sister and aunts are also in a position to provide him with emotional support following his release and remain supportive of him despite his actions here. Exhibit B, C, D.

### G. Mr. Jacob's Plans for Future

Further, he appears to have given real consideration to what he will do upon his release. Exhibit D. His history indicates that he is a smart and can succeed academically. He is interested in pursuing college courses and being a father to his two young sons. He has also given consideration to how he can lawfully support himself and his sons after completion of his sentence. He has also found healthier ways of coping with his grief and is committed to maintaining his sobriety upon release. Exhibit D. He recognizes his impetuous actions and appears to be committed to leading a law-abiding life in the future.

Based on the enclosed, Mr. Jacobs respectfully requests a downward variance. Thank you for your time and consideration.

Respectfully submitted,

Elizabeth K. Quinn
Assistant Federal Defender
Counsel for Anthony Jacobs

cc: Timothy Ly, A.U.S.A. (via email)